Mr. and Mrs. Jules Louis Vignes were tenants of a dwelling on Jeannette Street in New Orleans owned by Vincent Barbarra.
They seek from him recovery of damages alleging that because of a defect in the building, a porch swing, in which Mrs. Vignes was seated, fell, she sustaining serious personal injuries and Mr. Vignes being required to expend various sums for medical, hospital and other expenses.
It is alleged that in the year 1928, Mr. Barbarra, through a contractor, erected the building and that plaintiffs leased it and moved into it as soon as it was completed, and that "during the construction of said building, and as a part thereof, the defendant caused to be placed into the ceiling of the front porch of said premises two screw eyes for the use by any tenant of said premises, upon which to hang a porch swing." *Page 657 
It is also alleged that during the year 1933, petitioners hung a porch swing on said screw eyes, thus using them for the purpose for which they had been intended, and that on or about July 23rd, 1933, while Mrs. Vignes was seated in the swing, one of the screw eyes "pulled out of its fastening, causing the swing to fall on Mrs. Vignes' left leg, as a result of which she suffered a compound fracture of the left ankle and fractures of the bones of the left leg between the knee and the ankle."
It is charged that Barbarra is liable because of his having furnished "defective appurtenances in said premises" and that the screw eye pulled out because it had not been firmly placed in a "rafter above the ceiling" but instead had been "screwed into the ceiling at or about the tongue and groove portion thereof."
Defendant filed exceptions of no right of action and no cause of action contending that it is not the duty of a lessor to furnish such things as hooks or hangers for porch swings and that consequently, because of the effect of Article 2716 of the Civil Code, a lessor is not liable for injuries resulting from defects in such appurtenances.
These exceptions were overruled and defendant answered averring that he had not placed the screw eyes in the ceiling nor caused them to be placed there, averring also that "petitioners themselves placed said swing on said front porch and that they failed to exercise the proper care in placing said swing on said porch."
There was judgment for Mrs. Vignes in the sum of $5,000 and for Mr. Vignes for $570, and defendant has appealed and his counsel insist that the exceptions should have been maintained.
The overruling of the exceptions was not erroneous. It is true, of course, that by Article 2716 of the Civil Code it is required that certain repairs be made by the lessee, and we think it is also true that such things as hammock hooks, porch or swing hooks, etc., should be properly included among those things, and that they are contemplated by the last paragraph of the article, which places among the repairs to be made at the expense of the defendant, those "To windows, shutters, partitions, shop windows, locks and hinges, and everything of that kind, according to the custom of the place."
It is also true that it is now well settled that where a tenant fails to make such a repair of such defect which has become necessary after the commencement of the lease, there can be no recovery from the lessor for resulting injuries sustained by the tenant or by anyone else. Brodtman v. Finerty, 116 La. 1103, 41 So. 329; Harris v. Tennis, 149 La. 295, 88 So. 912; Moore v. Aughey, 142 La. 1042, 78 So. 110; Yates v. Tessier, 5 La.App. 214; Taul v. Graffato, 13 Orleans App. 338, and Farve v. Danna, La.App., 181 So. 823. But it is equally settled that even though there may be no duty in a lessor to make repairs to any of those things set forth in that article, nevertheless if a lessor undertakes to make such a repair, and does so negligently, and injury results, then liability may be fixed upon the lessor. Herbert v. Herrlitz, La.App., 146 So. 65, and Lowe v. Home Owners' Loan Corp., La.App., 1 So.2d 362. And we think it equally true that it is only where such repairs become necessary, after the commencement of the lease, that it is the duty of the tenant to make them, since under Article 2693 of the Civil Code, it is the duty of the lessor, at the commencement of the lease, to deliver the premises in good condition.
We find here the allegation that the screw eyes were placed in the ceiling by the lessor and before the commencement of the lease, and since, in considering the exception of no cause of action or no right of action, we must accept that allegation as fact, it follows that no maintenance of the exception is possible, for if it is true that the screw eyes were placed in the ceiling by the lessor or his agent, or if they were placed there before the lease commenced, then under the authorities cited, the lessor would be liable, even though the placing of screw eyes in a ceiling is not ordinarily among the duties of a lessor.
The disputed fact upon which determination of this case depends is whether the screw eyes had been placed in the ceiling by Barbarra or by the plaintiffs, themselves. It is the contention of plaintiffs that Barbarra caused them to be placed there while the building was under construction, while he maintains that he did not do so, and that he knew nothing whatever about them until he was informed of the accident. The building was erected in the year 1928, and the accident did not take place until July 23rd, 1933, or about 5 years later. The screw eye which pulled out of the ceiling had not been screwed into a joist, which is a beam to which ceiling *Page 658 
boards are affixed, but had been screwed into the bead of one of the tongue and groove boards of the ceiling. This bead is the thinnest part of the board and the record shows what is already evident and what is conceded by counsel for plaintiffs, that no experienced carpenter or contractor would have put a screw eye at that point. Counsel for plaintiffs admitted "* * * that anybody with ordinary intelligence would have put those screw hooks into the joists instead of into the planks of the ceiling", and this was also testified to by the contractor who erected the building. It is also shown that the two screw eyes were not properly aligned and that an experienced carpenter would have made certain to place them in proper alignment. These facts have significance because it is contended by plaintiffs that the eyes were put up while the building was in course of construction, and that probably the contractor, Mr. Bachemin, had put them up. Mr. Bachemin testified that he had had nothing to do with them, and furthermore, it is shown that he was an experienced contractor, and it would seem to follow that if he had put them up or had caused one of his experienced carpenters to do so, the job would not have been done as it was done.
Another thing which we deem of great importance in connection with the screw eyes is that when they were produced at the trial, it was admitted that they showed no evidence of having been painted with paint of any other color than yellow. This is important because the ceiling planks, which were offered in evidence, we think show conclusively that they had, at first, been painted either pink or salmon and had later been repainted with yellow paint. It seems to us very evident that if the screw hooks had been in the ceiling when the first pink or salmon paint was applied under the yellow, which shows on the hooks, the pink would have been discernible upon scraping through the yellow. Therefore, since we find it conceded that the hooks showed no signs of pink and yet the ceiling showed plainly an undercoat of pink, the hooks must have been put into the ceiling later on, and we think were not there during the time when the first coats of pink were applied. Of course, it is true that plaintiffs and all of their witnesses testified that when plaintiffs first moved into the house, the porch ceiling was yellow and that never at any time was that ceiling pink. But we are thoroughly convinced from all of the testimony that defendant's statement that the ceiling was first painted pink or salmon is correct. He testified to that effect positively and one of his nephews testified that in 1932 he had repainted the ceiling with yellow. A second nephew, who gave reasons for remembering the repainting of the porch, states that he, at times, watched his brother applying the yellow paint and that there is no doubt that it was at first pink and was later painted yellow.
The testimony of plaintiffs in this regard is not nearly so convincing as counsel would have us believe as, for instance, though they state that the ceiling was yellow and were very positive about this, they could not be certain about the color of other parts of the house. Mr. Vignes, for instance, was not positive of the color of the side of the house. He said:
"The whole house was painted yellow, if I am not mistaken," and later when asked what was the color of a certain post, he said:
"I can't tell you exactly what it was painted."
Mrs. Vignes, although she was quite positive that the ceiling was yellow all the time, was asked what was the color of the floor of the front gallery. She answered "I think it was a slate grey" but added "I never noticed that much about it." It seems to us very remarkable that these two plaintiffs should remember positively and definitely that some five years before the occurrence of the accident the ceiling of their porch had been painted yellow, and yet should not know definitely what was the color of the post, which was much more easily noticed, or what was the color of the floor of the porch which was even more often brought into view.
When we examine the testimony of the other witnesses of plaintiffs, who state that the ceiling of the porch was yellow, we think it all the more remarkable. In most instances these witnesses were relatives of the plaintiffs, and in one instance one of the witnesses showed that he had considerable animosity towards the defendant because the defendant had constructed his house without requiring the use of union labor. As we have stated, the testimony of these witnesses is most remarkable. It must be remembered that they did not live in the house, and obviously visited it only infrequently and noticed it only in passing by, and yet they are most positive that they can remember that, years ago, when the house was originally built the ceiling of the porch *Page 659 
was painted yellow. One witness went so far as to state that in the past several years he had lived in at least five different houses, and he undertook to give the color of the porch ceiling of each of those houses. It is very evident that these witnesses have very much overdone plaintiffs' case.
Then when we consider the testimony of the actual presence of the screw eyes, we think the same conclusion is inescapable. The record shows that it is not customary for landlords to install swing hooks or hammock hooks and that these are usually placed in rented buildings by the tenants themselves. But in order to make impressive their testimony to the effect that these eyes had been placed in the building by Barbarra, the plaintiffs testified that though they did not ask for the hooks, and did not, in fact, use them until five years after the building had been constructed, the landlord had caused them to be installed while the building was in course of construction and had "on several occasions" called attention to the fact that he was a remarkably good landlord, and even installed hammock hooks in all of his rented houses, and this testimony is also given by other witnesses, in most cases relatives of the plaintiffs, some of whom testified that they heard the landlord call attention to the fact that he was an exceptionally fine landlord and always furnished swing hooks.
There is discrepancy in the testimony of plaintiffs as to when they acquired the swing. The record shows that it was given to them by a relative who had no further use for it. Some of the evidence shows that it was given to them when they first moved into the building, and yet in spite of the fact that the hooks, so they say, had always been there, they did not hang the swing until nearly five years later.
Mrs. Vignes testified that after the building was erected, Barbarra noticed that she was not using the screw eyes and several times asked her why she did not put up a swing. In fact, she even went so far as to say that it was only after Mr. Barbarra had several times urged her to put up the swing that she had done so. In spite of the fact that Mrs. Vignes says that Barbarra urged her several times to hang a swing on the hooks, Mr. Vignes, in order to make the negligence of Barbarra stand out predominantly, testified that when he finally decided to put up the swing, he wanted to make sure that the eyes were strong and that he asked Barbarra whether they were strong, and that Barbarra had said that he had taken care to make them strong and, so says Vignes, "he said the ceiling would fall before the hooks fall."
The record shows that the defendant has a splendid reputation for veracity. All of the witnesses, both for the plaintiffs and defendant, who testified concerning his reputation admitted this and it is shown that he has been employed in one position for nearly fifty years and that, by careful husbanding of his resources, has accumulated a small amount which he has invested in rental houses.
On the other hand, the testimony of plaintiffs as we have said does not impress us at all. Among other things, the petition sworn to by Mrs. Vignes states that the bill of Hotel Dieu amounted to $35, whereas it is shown by Mr. Vignes, himself, that the bill amounted to $10. The petition also claims $15 for shoes and Mrs. Vignes testified that the shoes cost $7.50 a pair. It is true that an attempt is made by counsel to justify this by the statement that there were at least two pairs, but when the evidence of Mrs. Vignes showed that the shoes cost $7.50 a pair, counsel himself made the statement that the claim in the petition must have been erroneous.
To revert for a moment to whether the ceiling was painted yellow or pink when the house was built, we note from the record that counsel for plaintiffs are rather inclined to scoff at the idea that Mr. Barbarra could remember the color of the ceiling, and yet might not remember the color of certain posts; for instance, counsel said:
"If you don't remember the posts, maybe you could give some reason why you remember that the ceiling was painted pink."
If there was anything remarkable about the owner who was building the building remembering that the ceiling had been painted pink, how much more remarkable it would be for so many persons, who did not live in the building, to remember years after its erection, the exact color with which the ceiling of the porch had been painted.
We think we need say no more about the questions of fact which are involved. Plaintiffs' testimony is incredible whereas we are much impressed with that of defendant. It is true that only questions of fact are involved, and yet we are of the opinion that the decision on those questions of fact in the court below is obviously erroneous. *Page 660 
It is therefore ordered, adjudged and decreed that the judgment appealed from is annulled, avoided and reversed, and that plaintiffs' suit be and it is dismissed at their cost.
Reversed.